DONALD LOUIS MAZOR *v.* STATE OF MARYLAND, DEPARTMENT OF CORRECTION ET AL.

[No. 495, September Term, 1975.]

*Decided March 1, 1976.*

The cause was argued before POWERS, MENCHINE and DAVIDSON, JJ.

*Franklin I. Freeman* and *Wilson K. Barnes* for appellant.

*J. Kent Leonnig, Special Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General* and *H. George Meredith, Jr., Special Assistant Attorney General* on the brief, for appellee Subsequent Injury Fund.

*Charles R. Goldsborough Jr., Special Attorney,* with whom were *Francis B. Burch, Attorney General* and *J. Howard Holzer, Special Attorney* on the brief, for other appellee, State of Maryland, Department of Correction.

Menchine, J., delivered the opinion of the Court.

Donald Louis Mazor, (claimant) employed by the State of Maryland, Department of Correction as a penitentiary guard, on July 17, 1972 was injured in an inmate uprising.

As a result of the injury therein sustained, Mazor applied for and on September 1, 1973 was granted, under the State pension system, pursuant to Maryland Code Article 73B, § 11 (6) and (7),[1] life pension accidental disability benefits of $421.59 monthly.[2]

As a result of that same injury Mazor also filed a claim for workmen's compensation benefits against the State of Maryland, Employer and State Accident Fund, Insurer (employer and insurer). On October 30, 1974 he was awarded workmen's compensation benefits by the Workmen's Compensation Commission (Commission) at the rate of

---

1. Article 73B, § 11 (6) and (7) read as follows:

"(6) *Accidental disability benefit.* — Upon the application of a member, or of the head of his department, any member who has been totally and permanently incapacitated for duty as the natural and proximate result of an accident occurring while in the actual performance of duty at some definite time and place, without wilful negligence on his part, shall be retired by the board of trustees, provided that the medical board shall certify that such member is mentally or physically incapacitated for the further performance of duty, that such incapacity is likely to be permanent, and that such member should be retired. No beneficiary entitled to an accidental disability retirement allowance shall receive any allowance on account of ordinary disability.

"(7) *Allowance on accidental disability retirement.* — Upon retirement for accidental disability a member shall receive a service retirement allowance if he has attained the age of 60; otherwise he shall receive an accidental disability retirement allowance which shall consist of:

(a) An annuity which shall be the actuarial equivalent of his accumulated contributions at the time of his retirement; and

(b) A pension of sixty-six and two-thirds per centum of his average final compensation, but in no event shall his total accidental disability retirement allowance exceed his average final compensation."

2. The State claims an offset by reason of this payment, in any claim under the workmen's compensation laws. Claimant received also an annuity of $26.75 monthly under the terms of subsection (7) (a) above. The State does not contend that it is entitled to offset this actuarial equivalent of claimant's accumulated contributions.

$65.00 per week, not to exceed the sum of $26,000.00, for permanent disability under "other cases" calculated on the basis of 60% industrial loss of use of the body under Maryland Code Article 101, § 36 (4) (a).[3]

Employer and insurer contended that by virtue of the provisions of Maryland Code Article 101, § 33,[4] it was discharged in full from any liability or obligation to pay any benefit under Article 101 because of the life pension

---

**3.** Article 101, § 36 (4) (a) at the time of the subject injury read as follows: (Ch. 541, Acts 1971)

"36. (4) (a) In all other cases of disability other than those specifically enumerated disabilities set forth in subsection (3) of this section, which disability is partial in character, but permanent in quality, the Commission shall determine the portion or percentage by which the industrial use of the employee's body was impaired as a result of the injury and in determining such portion or percentage of impairment resulting in an industrial loss the Commission shall take into consideration, among other things, the nature of the physical injury, the occupation, experience, training and age of the injured employee at the time of injury, and shall award compensation in such proportion as the determined loss bears to the sum of $17,500, the said compensation to be paid weekly at the rate of sixty-six and two-thirds per centum of the average weekly wages, in no case to exceed thirty-five dollars per week, and not less than a minimum of twenty-five dollars per week unless the employee's established weekly wages are less than twenty-five dollars per week at the time of the injury, in which event he shall receive compensation equal to his full wages, subject to reconsideration of the degree of such impairment by the Commission on its own motion or upon application of any party in interest."

**4.** Article 101, § 33 reads as follows:

"In time of peace and while engaged in military service all officers and enlisted men of the organized militia of the State of Maryland shall be deemed workmen of the State for wages within the meaning of this section; provided that, whenever and so long as provision equal to or better than that given under the terms of this article is made by the federal government for an employee of the military department of Maryland injured in the course of employment, such employee shall not be entitled to the benefit of this article.

"Whenever by statute, charter, ordinances, resolution, regulation or policy adopted thereunder, whether as part of a pension system or otherwise, any benefit or benefits are furnished employees of employers covered under § 21 (a) (2) of this article, the dependents and others entitled to benefits under this article as a result of the death of such employees, the benefit or benefits when furnished by the employer shall satisfy and discharge pro tanto or in full as the case may be, the liability or obligation of the employer for any benefit under this article. Should any benefits so furnished be less than those provided for in this article the employer shall be liable to furnish the additional benefit as will

provided by the State of Maryland under Article 73B. The Commission found that the pension benefits provided by Article 73B were equal to or better than any weekly benefit the claimant could receive under any type of permanent disability awarded under Article 101. It is manifest, however, that the Commission adopted claimant's position that the State Accident Fund was not entitled to an offset under Section 33.

Employer and insurer and claimant appealed to the Circuit Court for Baltimore County with the cause thereafter being removed to the Circuit Court for Harford County for trial.

After motion filed in the Circuit Court for Harford County, Judge Close granted summary judgment in favor of the employer and insurer, "Because the Employer has provided benefits [under Article 73B, § 11 (6) and (7)] greater than those possible [5] under Article 101, it is relieved and discharged of any liability or obligation to provide benefits under it [by reason of § 33]."

Claimant on appeal asks us to decide that § 33 of Article 101 has no application to pensioned employees, but is limited in application solely to workmen's compensation cases where there have been awards of "benefits resulting from the death of an employee." Claimant recognizes that in *Nooe v. Mayor & City Council of Baltimore*, 28 Md. App. 348, 345 A. 2d 134 (1975),[5a] we considered the precise question here in issue.

---

make up the difference between the benefit furnished and the similar benefit required in this article.

"The Commission shall have full power to determine whether any benefit provided by the employer is equal to or better than any benefit provided for in this article, and to render an award against the employers to furnish additional benefit or benefits to make up the difference between the benefit furnished by the employers and the benefits required by this article as the case may be. This section shall also be subject to the continuing powers and jurisdiction of the Commission provided for in this article."

[5]. Judge Close in his Memorandum Opinion and Ruling had said:

"The Court need not reach the issue of the degree of Claimant's disability since the State's Retirement System provides benefits to him which are greater than any which could be awarded in the event he were totally and permanently disabled."

**5a.** Cert. den. January 6, 1976.

He asks us to reconsider our holding in *Nooe*, "* * * that the payment * * * of the pension [providing a benefit equal to or better than any benefit provided for in Article 101] satisfied and discharged in full the liability or obligation of the [employer] for any benefit under the Workmen's Compensation law." 28 Md. App. at 356 [139].

We have reviewed and now reaffirm our decision in *Nooe*. For the reasons stated in *Nooe* we reiterate that § 33 must be interpreted to apply to cases involving permanent disability and hold that under the circumstances of this case the section must be interpreted as applying to this claimant.

Alternatively, appellant contends that § 33 is unconstitutional under both the State and the United States Constitutions.[6]

The desirability for coordination of the overall system of wage-loss protection and the constitutional issues arising in statutory efforts to achieve it, are discussed in Larson's *Workmen's Compensation Law* in the following sections:

> "§97.00 Once it is recognized that workmen's compensation is one unit in an overall system of wage-loss protection, rather than something resembling a recovery in tort or on a private accident policy, the conclusion follows that duplication of benefits from different parts of the system should not ordinarily be allowed. Since most social legislation in the United States has appeared in unrelated fragments, lack of co-ordination resulting in cumulation of benefits is quite common; but newer legislation is more carefully drawn to prevent this result.
>
> "§97.10 Impropriety of duplicate benefits
>
> Wage-loss legislation is designed to restore to the worker a portion, such as one-half to two-thirds, of wages lost due to the three major causes of wage-loss: physical disability, economic unem-

---

6. *State Constitution:* Article III, § 40 (taking without compensation); Article 23 Declaration of Rights (Denial of due process). *United States Constitution:* Article I, Section 10 (impairment of the obligation of contract). Fourteenth Amendment (Denial of equal protection and due process).

ployment, and old age. The crucial operative fact is that of wage loss; the cause of the wage loss merely dictates the category of legislation applicable. Now if a workman undergoes a period of wage loss due to all three conditions, it does not follow that he should receive three sets of benefits simultaneously and thereby recover more than his actual wage. He is experiencing only one wage loss and, in any logical system, should receive only one wage-loss benefit. This conclusion is inevitable, once it is recognized that workmen's compensation, unemployment compensation, non-occupational sickness and disability insurance, and old age and survivors' insurance are all parts of a system based upon a common principle. If this is denied, then all coordination becomes impossible and social legislation becomes a grab-bag of assorted un-related benefits. For example, if workmen's com-pensation is thought of as a quasi-tort recovery, there will be a temptation to say that the injured workman should be entitled to keep the entire recovery without reference to any other legislative benefits he may receive for the same wage loss. Again, if non-occupational disability insurance is viewed, as it was for a time in Rhode Island, as essentially equivalent to private health and accident insurance, the argument will be heard that a worker has just as much right to keep both occupational and non-occupational disability benefits as he would have to collect both workmen's compensation and the proceeds of a private accident policy.

"§97.32 Constitutionality of the offset provision

The constitutionality issue is at this writing before the United States Supreme Court,[7] and consequently the discussion of the point will be

---

[7]. An apparent reference to Richardson v. Belcher, 404 U. S. 78, 92 S. Ct. 254, 30 L.E.2d 231 (1971), to be discussed *infra*.

confined to a brief account of the state of case law in the lower courts and the principal lines of argument. All but one [8] of the decisions on the constitutional issue in federal district and circuit courts have held the offset constitutional. The case for constitutionality is well expounded in the Sixth Circuit's opinion in *Lofty v. Richardson* [440 F. 2d 1144] * * *

The main line of attack in this case was that Congress did not also create an offset for such benefits as private insurance proceeds and recoveries in damage suits. The court reviewed the development of Supreme Court cases establishing a very broad congressional discretion in adopting classifications for legislative purposes. It then examined the legislative history of the offset, stressing that the main purpose was to eliminate the kind of duplication of benefits that in many instances resulted in total benefits exceeding actual previous wage while working. The court set out in full a table 'purporting to show that continued duplication of benefits under terms of the then pending bill would mean at least some payments in excess of prior average "take home pay" in every state, and up to a maximum of 247% in the instance of Arizona.' The adverse effect of this situation on incentives to become rehabilitated and to return to work was noted. As to the invidious classification argument, the court adduced three answers. The first was that there had been widespread complaints about double coverage as to compensation and social security, but no such complaints as to the proceeds of private insurance or negligence actions. The second was that administratively it would be relatively simple to enforce the compensation offset, while to calculate and apply a reduction for private insurance and

[8]. That one was reversed in Richardson v. Belcher, *supra.*

civil damages might offer severe difficulties. The third reason was the most important:

'Finally, it is entirely conceivable to us that Congress may have considered Social Security benefits and Workmen's Compensation benefits to be more arguably duplicative of one another than could appropriately be claims concerning Social Security benefits and the other two types of payments. Both Social Security and Workmen's Compensation are social welfare legislation. Private accident or disability insurance is a private contract, frequently paid for entirely by the recipient. And, of course, court awards for injuries are private rights derived from the common law involving the principle of compensation for negligence or fault.

Most of the argument for the Workmen's Compensation offset came from employers who generally pay all of the costs for Workmen's Compensation and half of the costs of the Social Security benefits. Their argument before Congress was that they were paying twice for the same injury. This argument would have, of course, no merit at all in relation to a damage action award or to the proceeds of privately purchased accident or disability insurance.' " [Quotation from *Lofty v. Richardson* cited in text.]

*Lofty v. Richardson*, 440 F. 2d 1144 (6th Cir. 1971) dealt with a congressional offset amendment requiring reduction of social security disability benefits when their recipients also are receiving State workmen's compensation benefits and the combined total of both exceed 80% of the worker's average wage. The Court rejected the contention that the offset statute's failure to include benefits derived from private insurance or from civil damage suits produced "an arbitrary and capricious classification which cannot stand

when tested against the due process clause" (at 1146). In doing so the Court pointed out that "* * * there is a good deal of case law which serves to illustrate the breadth of legislative power accorded the Congress (or the states) by the Supreme Court's interpretation of the constitutional limitations contained in the due process and equal protection clauses" (at 1146). *See: e.g. Admr., Motor Veh. Adm. v. Vogt,* 267 Md. 660, 676, 299 A. 2d 1, 9 (1973), declaring: "* * * a cardinal rule to be observed in determining whether a statute is violative of the Equal Protection Clause is that the legislature exercises a broad scope of discretion in establishing classifications, subject only to the requirement of reasonableness in doing so."; *A & H Transp. Inc. v. Baltimore,* 249 Md. 518, 529, 240 A. 2d 601, 606 (1968), declaring, "These [constitutional] limits are not exceeded under the due process clauses of the Maryland and Federal Constitutions unless the party challenging the ordinance can show that it is arbitrary, oppressive or unreasonable."

Appellant contends, without justification, we think, that the *pension* provided by Article 73B constitutes a contract that may not be impaired. We find it plain that the *pension* is a benefit or gratuity provided by the State entirely at its expense. Article 73B, § 1 (17) (1975 Cum. Supp.) defines the word *pension* as follows:

> " 'Pension' shall mean payments for life derived from money provided by the State. All pensions shall be payable in equal monthly installments."

The statute makes a clear distinction with respect to an *annuity* resulting from employee contributions.[9]

The last mentioned contention, among others, fades away with the Supreme Court's decision in *Richardson v. Belcher,* 404 U. S. 78, 92 S. Ct. 254, 30 L.Ed.2d 231 (1971). In *Richardson,* as in *Lofty,* supra, the Court was dealing with the Federal statute requiring reductions in social security

---

9. Subsection (16) (1975 Cum. Supp.) provides:

" 'Annuity' shall mean payments for life derived from the accumulated contributions of a member. All annuities shall be payable in equal monthly installments."

disability benefits when the recipients received workmen's compensation benefits. In *Richardson* it was said at 80 [256-57] [234]:

"In our last consideration of a challenge to the constitutionality of a classification created under the Social Security Act, we held that 'a person covered by the Act has not such a right in benefit payments as would make every defeasance of "accrued" interests violative of the Due Process Clause of the Fifth Amendment.' Flemming v. Nestor, 363 U. S. 603, 611, 80 S. Ct. 1367, 1373, 4 L.Ed.2d 1435. The fact that social security benefits are financed in part by taxes on an employee's wages does not in itself limit the power of Congress to fix the levels of benefits under the Act or the conditions upon which they may be paid. Nor does an expectation of public benefits confer a contractual right to receive the expected amounts."

The Court added at 81 [257] [235]:

"The appellee argues that the classification embodied in § 224 is arbitrary because it discriminates between those disabled employees who receive workmen's compensation and those who receive compensation from private insurance or from tort claim awards. We cannot say that this difference in treatment is constitutionally invalid.

"A statutory classification in the area of social welfare is consistent with the Equal Protection Clause of the Fourteenth Amendment if it is 'rationally based and free from invidious discrimination.' Dandridge v. Williams, 397 U. S. 471, 487, 90 S. Ct. 1153, 1162, 25 L.Ed.2d 491. While the present case, involving as it does a federal statute, does not directly implicate the Fourteenth Amendment's Equal Protection Clause, a classification that meets the test articulated in *Dandridge* is perforce consistent with the due process requirement of the Fifth Amendment."

The Court concluded by saying at 84 [258] [236]:

> "If the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals, then the action of Congress is not so arbitrary as to violate the Due Process Clause of the Fifth Amendment."

Constitutionality of offset statutes similarly has been upheld in State Court decisions. *See: e.g. Myers v. State,* 428 P. 2d 83 (Colorado 1967); *Lyons v. City of Los Angeles,* 119 Cal. Rep. 159 (Court of Appeal 2d Dist. Div. 3 1975). See also other cases in accord as listed in footnote 2 of *Richardson v. Belcher, supra.*

Because we accept the rules of law declared in the cited cases as proper to be applied to the facts and circumstances of the subject case, we deem it unnecessary to engage in a particular discussion of the many cases cited by appellant. It will suffice to say that we have concluded that they are distinguishable on their facts or express legal views to which we will not adhere, or both.

The decisions heretofore cited and adopted by us herein, have answered all constitutional issues posed here save two. They are: (1) the suggestion that the offset statute involves an unconstitutional classification in that it applies to State employees to the exclusion of others, and (2) that it permits an unconstitutional taking in violation of Maryland Constitution Article III, § 40.[10]

We see merit in neither contention. As to the suggested invidious discrimination, see *Strohmeyer v. Southwestern Bell Telephone Co.,* 396 S.W.2d 1 (Mo. App. 1965). As to the last remaining contention, if we assume, *arguendo,* that Article 73B, § 16 conferred a contractual

---

10. Article III, § 40 reads as follows:

"The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation."

vested right upon the claimant, it remains crystal clear that Article 101, § 33 took nothing thereby conferred.

We see no error.

*Judgment affirmed.*
*Appellant to pay the costs.*